**Opinion filed September 17, 2020**



**In The**

# Eleventh Court of Appeals

_____

## No. 11-18-00239-CR

_____

## EFREN CARRILLO HINOJOS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 385th District Court**

**Midland County, Texas**

**Trial Court Cause No. CR49543**

## MEMORANDUM OPINION

After the grand jury indicted Efren Carrillo Hinojos, Appellant, for the offense of intoxication manslaughter, he filed a motion to suppress the results of a blood draw. The trial court heard the motion and overruled it. Appellant subsequently entered a plea of guilty. The trial court found Appellant guilty of intoxication manslaughter and assessed Appellant's punishment at confinement for ten years. This appeal is from the trial court's denial of Appellant's motion to suppress. We affirm.

Sometime prior to 2:28 a.m. on March 4, 2017, according to the testimony of Christopher Weimer, who was then a Texas Department of Public Safety trooper,[1] Appellant drove his vehicle into the lane of oncoming traffic and collided head-on with another vehicle. The driver of the other vehicle died in the collision.

Trooper Weimer testified that he arrived at the "very chaotic" scene at 2:34 a.m. EMS personnel were already there, as were other officers. Trooper Weimer noted that Appellant had "submarined." "Submarined" is a term used to describe that Appellant had slid from the driver's seat to underneath the dash. That situation is indicative of the fact that Appellant was not restrained.

When Trooper Weimer first talked to Appellant, EMS personnel were attempting to get Appellant out of his vehicle. Appellant was initially incoherent and "appeared to be in pain, moans and groans." As Trooper Weimer asked Appellant questions, Appellant became more coherent. Appellant gave Trooper Weimer his name and told Trooper Weimer that, although he could not remember where he was coming from, he was going home to Andrews. Trooper Weimer noticed an open Bud Light beer bottle in the floorboard near the driver's seat. He also noticed a green leafy residue in the center console cupholders; the substance was consistent with marihuana residue.

EMS personnel transported Appellant by ambulance to the emergency room. Trooper Weimer followed the ambulance. The EMS personnel told Trooper Weimer that Appellant was under the influence of alcohol. Trooper Weimer then began to read the statutory warning contained in a DIC-24. A DIC-24 is a form that contains a warning as to the consequences of voluntarily providing a specimen of breath or blood as opposed to the consequences of a refusal to do so. While in the emergency

---

[1]At the time of trial, Trooper Weimer was a special agent assigned to dignitary protection. We will refer to him by using his classification at the time of the offense.

2

room, Appellant was "in and out of consciousness, varying levels of cooperativeness, and even in some cases uncooperative with nursing staff or emergency staff." While Trooper Weimer was reading the DIC-24 warning to Appellant, Appellant "either f[e]ll asleep or in some manner bec[a]me unconscious."

At some point after Trooper Weimer had read the DIC-24 warning to Appellant, Trooper Weimer made sure that Appellant was awake and asked him whether he would give a specimen of his blood. Trooper Weimer testified that Appellant responded with what he thought was a "yeah." Because he wanted to be sure of Appellant's answer, Trooper Weimer asked Appellant, "Was that a yes?" Trooper Weimer testified that Appellant "stated very clearly, 'Yes,'" and that Appellant unequivocally voluntarily gave his consent.

At the hearing on the motion to suppress, Appellant presented expert testimony from Dr. Sean Kevin Roden, who, among many other qualifications, was a board-certified emergency medicine physician. Dr. Roden did not examine Appellant, but he had reviewed the medical records relative to the incident.

In addition to a review of the emergency room records, Dr. Roden reviewed the records from a Dr. Bassett, "a local surgeon." The records of Dr. Bassett that Dr. Roden reviewed were from approximately forty hours after the incident. Dr. Bassett's diagnosis was "postconcussive syndrome with retrograde amnesia."

The initial medical records that Dr. Roden reviewed also contained a notation that Appellant's pupils were dilated. The records further contained a notation that the dilation was symmetrical. If the pupils had been asymmetrical, according to Dr. Roden, that would lean toward a finding of brain injury. Dr. Roden also opined that there were other things that could cause pupils to be dilated.

Dr. Roden expressed his opinion that, from his review of the medical records, Appellant suffered a traumatic brain injury in the collision. He further testified that Appellant's capacity was critically and acutely impaired and that someone without

capacity could not voluntarily consent. Later in his testimony, Dr. Roden restated his opinion that Appellant had suffered a mild traumatic brain injury, "a/k/a concussion," and that it would affect Appellant's capacity to consent.

However, on cross-examination, Dr. Roden acknowledged that Dr. Larry Edwards, a radiologist, had read a CT scan some three and one-half hours after the collision and that Dr. Edwards had found no indications of a concussion or head trauma. Although one can have a traumatic brain injury that does not show on a CT scan, Dr. Roden testified that he would have no reason to disbelieve Dr. Edwards. Dr. Roden further testified that, without being there in person, "there's no way I can tell you absolutely he did or did not have a traumatic brain injury at that time or -- or I can't tell you what the level of severity it was at that time, specifically at 5:30 a.m."

Although Appellant was released from the hospital early the next morning, Dr. Roden testified that he would not release a patient that soon if the patient had suffered a concussion. Further, it was noted that Appellant's discharge instructions did not suggest a follow-up for concussion issues.

Dr. Roden was asked whether someone with almost three times the legal limit for intoxication would be combative and have trouble with consciousness. Dr. Roden opined that those conditions would be consistent with the consumption of alcohol. From a medical standpoint, according to Dr. Roden, intoxication "can and very easily resembles traumatic brain injury. Sometimes you can't tell one [from] the other."

Appellant presents two issues on appeal. In his first issue on appeal, Appellant maintains that the State failed to prove by clear and convincing evidence that Appellant's consent to the blood draw was valid and that the warrantless blood draw was justified. In his second issue on appeal, Appellant asserts that the trial court erred when it refused to suppress the blood-draw evidence because of a violation of

4

Section 724.015 of the Texas Transportation Code. *See* TEX. TRANSP. CODE ANN. § 724.015 (West 2011).

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We are to review a trial court's factual findings for an abuse of discretion. *Id.* We will give almost total deference to a trial court's determination of historical facts, especially so when a trial court's fact findings are based on an evaluation of credibility and demeanor. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). The same deference is afforded the trial court with respect to its rulings on the application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor. *Id.* In situations that involve mixed questions of law and fact that do not fall within that type of evaluation, a reviewing court conducts a de novo review. *Id.*

At a hearing on a motion to suppress, the trial court is the exclusive trier of fact and judge of the credibility of the witnesses. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). A trial court may choose to believe or to disbelieve all or any part of a witness's testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). We are to view the evidence in the light most favorable to the trial court's ruling, and we are to uphold that ruling on a motion to suppress if it is supported by the record and if it is correct under any applicable theory of law. *State v. Castleberry*, 332 S.W.3d 460, 465 (Tex. Crim. App. 2011); *Ross*, 32 S.W.3d at 855–56.

The Fourth Amendment to the Constitution of the United States provides protection against unreasonable searches and seizures. U.S. CONST. amend IV. The Texas constitution also protects against unreasonable searches and seizures. TEX. CONST. art. I, § 9. Bodily intrusions are searches. *Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016). Warrantless searches of a person are unreasonable

unless the search falls within some recognized exception to the warrant requirement. *Id.* Exceptions to the requirement of a search warrant include voluntary consent to search. *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003).

There is no question that the blood draw in this case was obtained without a warrant. Therefore, the burden fell upon the State to show that the search fell within some exception to the warrant requirement. *State v. Woodard*, 341 S.W.3d 404, 412 (Tex. Crim. App. 2011). That burden is proof by a preponderance of the evidence under the United States Constitution and by clear and convincing evidence under the Texas constitution. *Maxwell*, 73 S.W.3d at 281

In this case, the State relies upon the voluntary consent exception to the warrant requirement.

The trial court heard testimony from Trooper Weimer to the effect that Appellant was intoxicated. Trooper Weimer also testified that, when he asked Appellant whether Appellant would consent to a blood draw, Appellant unequivocally answered, "Yes."

Dr. Roden testified that, in his opinion, Appellant suffered from a traumatic brain injury—a concussion—and that that would affect Appellant's ability to consent. However, Dr. Roden also agreed that Dr. Edwards, the radiologist who read the CT scan, found no evidence of a traumatic brain injury and that, at times, it was hard to tell the difference between a traumatic brain injury and intoxication. Dr. Roden found no reason to disbelieve Dr. Edwards. Dr. Roden also agreed that the initial medical records contained no indication that there was any traumatic brain injury. Dr. Roden based his opinion upon Appellant's medical records; he did not examine Appellant.

The trial court was presented with evidence that was contradictory. As we have said, the trial court was the exclusive trier of fact and judge of the credibility of the witnesses. *Maxwell*, 73 S.W.3d at 281. As such, the trial court was at liberty

to believe or to disbelieve all or any part of the witnesses' testimony. *Ross*, 32 S.W.3d at 855. When we view the evidence in this record in the light most favorable to the trial court's ruling, we hold that the trial court did not abuse its discretion when it denied Appellant's motion to suppress. Under the totality of the circumstances, and the standards of review that we have outlined, we cannot say that the trial court erred when it denied Appellant's motion to suppress. We overrule Appellant's first issue on appeal.

Because we have overruled Appellant's first issue on appeal and have upheld the trial court's determination that Appellant voluntarily consented to the blood draw, we need not discuss the applicability in this case, if any, of the implied consent provisions contained in the Texas Transportation Code.

We affirm the judgment of the trial court.


JIM R. WRIGHT
SENIOR CHIEF JUSTICE

September 17, 2020

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[2]

Willson, J., not participating.

---

[2]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.